UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal Action No.: 05-30040-MAP |
| | ) |
| NEFTALY ROSADO | ) |

## MEMORANDUM IN SUPPORT OF MOTION FOR DOWNWARD DEPARTURE

### I.     INTRODUCTION

On November 15, 2005, Neftaly Rosado pled guilty to 21 U.S.C. § 846—"Conspiracy to

Distribute Cocaine Base"—and 21 U.S.C. § 841 (a) (1)—"Possession with Intent to Distribute

Cocaine Base." Pursuant to 21 U.S.C. § 841 (a) (1) and § 846, the term of imprisonment is a five

(5) year minimum mandatory (60 months) on each count. A statutory minimum mandatory

obligates the court to sentence Mr. Rosado to at least the statutory minimum term of

imprisonment unless he meets the requirements of 18 U.S.C. § 3553 (f) (1)—(5) and U.S.S.G. §

5C1.2—i.e. the "safety valve" provision of the U.S.S.G. **See Presentence Report ¶¶ 68-69.**

Both the government and Mr. Rosado assert that he has met the requirements for 18

U.S.C. § 3553 (f) (1)—(5) and pursuant to U.S.S.G. § 5C1.2 is entitled to be sentenced under the

"safety valve" provision of the U.S.S.G. **See Presentence Report ¶ 69; See Exhibit "A"—**

**Defendant's Statement of Facts.** The Presentence Report indicates that Mr. Rosado has met

requirements one (1) through four (4) to be eligible for the "safety valve" provision. **See**

**Presentence Report ¶ 69.** In satisfaction of the fifth (5th) requirement, Mr. Rosado has attached

a Statement of Facts which has been disclosed to the United States Attorney's Office and the

United States Probation Office with no objection. **See Exhibit "A"—Defendant's Statement of**

**Facts.** In fact the government, through Assistant United States Attorney Paul Smyth, reviewed

the state and agree that it satisfies the fifth (5th) and final requirement for the "safety valve" provision. Therefore, Mr. Rosado respectfully requests that this court disregard the statutory minimum mandatory and sentence him within the appropriate guideline range as suggested below.

## II.    PROPOSED GUIDELINE RANGE

The Presentence Report calculates Mr. Rosado's Total Offense Level to be twenty-one (21) with a Criminal History Category I:

| | |
|---|---|
| **Base Offense Level:** | **26** |
| **Specific Offense Characteristics:** | **0** |
| **Adjustment for Acceptance of Responsibility:** | **-3** |
| **Adjustment under U.S.S.G. § 2D1.1:** | **-2** |
| **Total Offense Level:** | **21** |

Pursuant to this calculation the United States Probation Office suggests that his guideline range should be between thirty-seven (37) and forty-six (46) months. **See Presentence Report ¶ 69.**

Based upon the above recommendation, Mr. Rosado requests that this court consider three (3) further areas for departure from the proposed base offense level under the U.S.S.G. First, Mr. Rosado requests a four (4) level decrease under U.S.S.G. §3B1.2 as he had "minimal participation" in the concerted activity. Second, pursuant to § 5H1.6, Mr. Rosado's family ties and responsibilities are such that a downward departure is warranted. Third, there are mitigating circumstances not adequately taken into consideration by the U.S.S.G. pursuant to §5K2.0 which justify a departure.

## III.    REQUESTS FOR DOWNWARD DEPARTURE

A.    **Pursuant to U.S.S.G. § 3B1.2, Mr. Rosado had "minimal participation" in the concerted activity and thus should be afforded a four (4) level reduction in his base level offense calculation instead of the two (2) levels proposed in the Presentence Report.**

Under U.S.S.G. §3B1.2, a defendant's base offense level may be decreased as a result of his role in the concerted activity which makes up the basis for the offense. Specifically, §3B1.2 (a) allows for a four (4) level decrease if the defendant was a minimal participant. U.S.S.G. §3B1.2. The First Circuit has stated that, "[t]o qualify as a minimal participant, a defendant must prove that he is among the least culpable of those involved in the criminal activity. In our view, this entails proof that he is substantially less culpable than his cohorts in the actual offense and that he is substantially less culpable than the vast majority of those taking part in similar crimes." United States v. Santos, 357 F.3d 136, 142 (1st Cir. 2004). See U.S.S.G. § 3B1.2, cmt. (nn.3(A), 4, 5). See also United States v. Kerr, 13 F.3d 203, 206 (7th Cir.1993) (refusing reduction for minimal participation where defendant did not prove that she was substantially less culpable than the average participant in similar crimes); United States v. De La Cruz, 996 F.2d 1307, 1314 (1st Cir.1993) (giving as examples of a minimal participant "someone who played no other role in a very large smuggling operation than to offload part of a single marijuana shipment" or someone who "was recruited as a courier for a single smuggling operation involving a small amount of drugs") (quoting U.S.S.G. § 3B1.2 cmt. (n.2)). "In short, a defendant must be a plainly peripheral player to justify his classification as a minimal participant." Santos, 357 F.3d at 142.

In the following matter, Mr. Rosado has submitted a Statement of Facts which outlines the details from the events on January 11, 2005. **See Exhibit "A"—Defendant's Statement of Facts.** This statement, coupled with the facts stated in the Presentence Report, show that Felix Morales, not Mr. Rosado, was the "engineer" behind orchestrating and carrying out the instant offense. **See Exhibit "A"—Defendant's Statement of Facts; See Presentence Report ¶¶ 11-16.** Although Mr. Rosado was present and participated briefly, he is without a doubt the less culpable of the two defendants as he was "a plainly peripheral player". Santos, 357 F.3d at 142.

As the Presentence Report and the Mr. Rosado's Statement of Facts indicate, it was Mr. Morales who directed the Confidential Witness (CW) to his apartment with the promise to obtain cocaine. **See Exhibit "A"—Defendant's Statement of Facts; See Presentence Report ¶ 13.** It was Mr. Morales who had conversations with the CW about the price, quantity, and type of narcotics. **See Presentence Report ¶ 14.** It was Mr. Morales who received the money during the transaction and it was Mr. Morales who took the CW to another location to receive the crack cocaine. **See Presentence Report ¶ 15.** Besides being present for the aforementioned actions the only part that Mr. Rosado actively took was when he weighed the crack cocaine and handed to the CW. **See Exhibit "A"—Defendant's Statement of Facts; See Presentence Report ¶ 16.**

This conduct, although culpable, is clearly less culpable than Mr. Morales' conduct and should receive the appropriate four (4) level reduction under U.S.S.G. §3B1.2 for his "minimal participation" in the above offense.

     **B.**     **Pursuant to U.S.S.G. § 5H1.6, Mr. Rosado should be granted a downward departure due to his family ties and responsibilities.**

The First Circuit allows downward departure based on familial relationships when the circumstances are "unusual or other than ordinary." United States v. Scalmo, 997 F.2d 970, 973 (1st Cir. 1993) (noting that the presence of a live in boyfriend was so vital to the emotional well being of a child in the house that downward departure was warranted). In determining whether a departure is warranted under "family ties and responsibilities" the court can consider numerous factors, including: (1) the seriousness of the offense; (2) involvement by other family members in the offense; and (3) the dangers to other family members of the Defendant as a result of the offense. See U.S.S.G. §5H1.6. Further, when a departure under this section is based upon a "loss of caretaking or financial support" a court must consider these additional factors: (1) whether serving the applicable sentence will cause a substantial, direct, and specific loss of

essential caretaking, or essential financial support, to the defendant's family; (2) whether the loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant; (3) whether the loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available; and (4) whether the departure will address the loss of caretaking or financial support. See U.S.S.G. §5H1.6.

In the following matter, Mr. Rosado's parents are both stricken with the AIDS virus and he is their primary caretaker. **See Exhibit "B"—Letters in Support.** Mr. Rosado is instrumental in taking care of his parents by performing everyday functions for them such as cooking, cleaning, providing transportation to their doctors' appointments, making sure their prescriptions are filled, and that they take their medication. **See Exhibit "B"—Letters in Support.** Further, he helps his parents raise his younger brother and provides emotional support while they struggle with their terminal illnesses. **See Exhibit "B"—Letters in Support.** Although his siblings, as well as some extended family members, help him with these caretaking functions, his absence will create a difficult situation for his parents which cannot be substituted by his existing family members. **See Exhibit "B"—Letters in Support.**

Pursuant to factors listed in U.S.S.G. §5H1.6, Mr. Rosado respectfully requests that this court depart downward due to the aforementioned facts and circumstances. Mr. Rosado's extended absence from his parents could have an accelerating effect on their already debilitating disease and an appropriate departure to level seventeen (17)—which provides for a sentencing range between twenty-four (24) and thirty (30) months—would be warranted and just.

**C.     Mitigating circumstances exist which have not been adequately taken into account by the U.S.S.G. and thus justify a departure under § 5K2.0.**

The Supreme Court, in <u>Koon v. United States</u>, 518 U.S. 81(1996), opened the door for downward departure from the United States Sentencing Guidelines. The <u>Koon</u> Court emphasized allowing sentencing judges to weigh the facts and circumstances in each case and to mitigate or magnify the sentence as those facts and circumstances permit. 518 U.S. at 112. The Court noted that the Sentencing Guidelines allow the sentencing court to take into account individual circumstances that are aggravating or mitigating, not considered by the Sentencing Commission when formulating the guidelines. 18 U.S.C. §3553(b); <u>Id.</u> at 92. The Supreme Court recognizes that the District Courts must weigh these facts and circumstances to assess whether a particular case falls within the heartland of the applicable guidelines. <u>United States v. Williams</u>, 78 F. Supp. 2d 189 (S.D. N.Y. 1999); U.S.S.G. §4A1.3 (holding that the sentencing court may conclude that the defendant's criminal history was significantly less serious than that of most defendant's in the same criminal history category). A court may depart from the guidelines if it finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into account by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. U.S.S.G. § 5K2.0 (citing 18 U.S.C § 3553(b)) (1998). The Sentencing Commission has provided guidance in making departure decisions by listing certain factors that are "forbidden" bases for departure, "discouraged" bases for departure, and "encouraged" bases for departure. <u>Koon v. United States</u>, 518 U.S. 81, 93-95 (1996). The Supreme Court has adopted the following test for determining whether to depart: (1) What factors of the case make it special or unusual?; (2) Has the Commission forbidden departures based on those factors?; (3) If not, has the Commission encouraged departures based

on those factors?; and (4) If not, has the Commission discouraged departures based on those factors? Id. at 95.

The Koon Court emphasized allowing sentencing judges to weigh the facts and circumstances in each case and to mitigate or magnify the sentence as those facts and circumstances permit. 518 U.S. at 112. The Koon Court noted that the U.S.S.G. provides the courts with a set of typical cases that embody the conduct that each guideline describes. Id. See also, United States v. Rivera, 994 F.2d 942, 947 (1993). A case that falls outside of the "heartland" case described by the Guidelines, due to its unusual features, is a candidate for departure. Id. The Guidelines advise the sentencing courts of what factors make a case atypical and take it out of the considered "heartland." United States v. Pereira, 272 F.3d 76 (1st Cir. 2001) (noting a defendant's irreplaceable care of a family member is a factor that takes a case out of the Sentencing Guidelines' heartland). If the special factor is a forbidden factor, the sentencing court cannot use it as a basis for departure. If the special factor is an encouraged factor, the court is authorized to depart if the applicable Guideline does not already take it into account. If the special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable Guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. If a factor is unmentioned in the Guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland. Koon, 518 U.S. at 95-96.

Further, Congress has deferred to the Commission the role of deciding what constitutes a sufficient sentencing range in the typical case, consistent with these purposes. But that range

7

contemplates only the typical cases, ones that fall within the so-called "heartland." <u>See</u> U.S.S.G. Manual Ch. 1 Pt. A at 6 (1998). If the circumstances of the case reveal that the purposes of sentencing have been fully or partially fulfilled prior to the imposition of sentence, a sentence within the range set forth by the guidelines may be "greater than necessary" to satisfy those purposes. 18 U.S.C. § 3553(a).

While taking into consideration his family ties and responsibilities, Mr. Rosado draws this courts attention to his difficult childhood and the obstacles that he has been presented with during his life. **See Exhibit "B"—Letters in Support; See Exhibit "C"—Dr. Sherry's Report.** Many factors contributed to Mr. Rosado's existing situation, including but not limited to, his parents' previous drug history, the street violence he was exposed to at a young age, and the sexual experiences that he was subjected to as a young boy. **See Exhibit "C"—Dr. Sherry's Report.** In light of all this, Mr. Rosado has an excellent talent for writing, singing, and producing music. This talent is particularly notable as Mr. Rosado is committed to pursuing this type of career after his release.

In viewing the totality of the circumstances, Mr. Rosado should be afforded a downward departure as the above-mentioned situation takes this matter outside the "heartland" for which the guidelines allow downward departures.

## IV.    **CONCLUSION**

For the foregoing reasons, Mr. Rosado respectfully requests that this honorable court depart downward from the proposed Total Offense Level of twenty-one (21) to level seventeen (17). In accordance with a Total Offense Level of seventeen (17) and a Criminal History Category I, Mr. Rosado respectfully requests this court impose a sentence of twenty-four (24) months pursuant to the applicable guideline range.

Respectfully Submitted,
Neftaly Rosado
By His Attorney:


Joseph D. Bernard
The Law Offices of Joseph D. Bernard, P.C.
73 State Street, Suite 301
Springfield, MA 01103
(413) 731-9995
(413) 730-6647 fax
BBO#: 557986

Date:   March 20, 2006

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) **Criminal Action No.: 05-30040-MAP** |
| | ) |
| **NEFTALY ROSADO** | ) |

## DEFENDANT'S STATEMENT OF FACTS PURSUANT TO §5C1.2 AND 18 U.S.C. §3553(f)(1)—(5)

On January 11, 2005, Felix Morales and I were at my apartment located at 97 Cliftwood Street, Springfield, MA. Felix informed me sometime during the day that his "boy" was coming by and that we were going to "hook him up with something." I understood this to mean that we were to sell his "boy" some cocaine.

Sometime thereafter a male came by the apartment looking for Felix. I later discovered that this individual was a confidential witness (CW) for the government. This was the first time I had met this CW and prior to this meeting Felix Morales had all conversations with this individual. However, I was present and involved when the CW arrived on January 11, 2005 and we had conversations about purchasing crack cocaine.

I remember that it appeared from the conversation as though Felix Morales and the CW had already discussed this purchase before he arrived at the apartment. Felix then called his supplier of crack cocaine and the three (3) of us left in the CW's car to pick it up. I knew that we were going to pick up drugs from Felix's "supplier" but I did not know the quantity that Felix was going to purchase and I did not know how much the CW wanted to buy. I stayed in the car with the CW as Felix went inside a house and returned to the car with crack cocaine. We then left this house and returned to our apartment.

After we returned to our apartment at 97 Cliftwood I grabbed a scale and began to weigh the drugs. I must have learned of the amount the CW wanted to purchase before I began to weigh but I don't remember when I learned of this amount. I then handed the CW the drugs. I think he handed Felix Morales the money. After this was completed the CW left our apartment.

Date: 3/2/06 .

Neftaly Rosado

# EXHIBIT B

To whom it may concern;

For many years I have seen this individual Neftaly Rosado grow up in front of my eyes. Through rough times and good times he has always been there. He is a truly remarkable individual always looking positive towards life, he never gives up, always trying to succeed, failure is not an option for him. Succession is. Neftaly has made an impact in my life he has showed me that I can get through my trials and tribulations no matter what happens. He is the one that would dry my tears with a single smile and made me realize that nothing in life is difficult if you take

it one day at a time. Neftaly showed me that I have a lot of opportunitys in life, and all I am asking is to please, please give him the same opportunity he showed me in return. Neftaly has only been trying to fix his mistakes, everybody is entitled to make mistakes and hes trying his best to fix them. Please don't take for granted a beautiful soul like Neftaly he's very precious and dearly loved by everyone. Thank you.

Sincerely,

Janine

March 17, 2006

Carmen Fuster
141 Union Street
Springfield, MA 01105

Dear Sir or Madam:

My name is Carmen Fuster and I'm the grandmother of Neftaly Rosado. You can say I have a partial part in raised Neftaly. Now that my daughter became much ill and recently had an operation, I've been around much more. Neftaly loves his mother so much that he takes part in caring for her a long with his father. Having both parents that are sick isn't a walk in the park and an old woman as myself; it becomes more difficult with each passing day.

Neftaly is responsible for taken then to appointment, programs, and making sure they take their medication. He is the only one in my family with a license and a car.. Neftaly help with the cooking, cleaning and sometime bathing. I'm currently stay their twice a week for support. I try to help the best I can but Neftaly does the majority of the work. Not to mention, he help with his little brother school wise.

I will like to request with the up most respect that Neftaly Rosado reframe from doing the time so that he is able to care for his mother and father. There is no one else to care for my daughter and her husband. Neftaly live with them and is young and strong enough to deal with the both of them. Not to mention he has the means to move around with them. If you allow this old woman this request, Neftaly will continue to do the program, check in with probation, or anything you request of him.

Thank You for taking the time to listen to an old woman request.

Carmen Fuster Sincerely,

*Carmen Fuster*

111 Massachusetts Ave
Springfield, MA 01109
413-273-1177

March 17, 2006

Federal Court
1550 Main Street
Springfield, MA 01103
413-785-0015

Your Honor:

My name is Madeline Rosado and I'm the mother of Neftaly Rosado. Let me first begin by
telling you that my son is a very respectful and loving young man. He has always been
through out his life. He has been wonderful toward myself and my husband.

Specially now because we're both ill and no one is able to take care of us. Neftaly has taken
the responsibility and have been taking care of us both for some time now. He also helps
with the cooking, cleaning, grocery and daily chores. He is constantly running errands or
taking one us to our appointment. Not intentionally but we keep Neftaly frequently busy.

Neftaly is the only one that has his license and purchases a vehicle for us; so that we don't
have to take a bus to our appointment or programs. I have to see a lot special doctor because
of my condition. Most times I'm unable to walk because of my illness, weight and my
swelling ankles. Neftaly helps me to walk, move around to the bathroom and so on. I
recently had an operation because the doctor found a tumor in my stomach. I wasn't
allowed to leave the house for sometime.

I'm aware that Neftaly action is inexcusable but he has except responsibility for it.
Sometime I think if only I didn't put that much responsibility on him, that he wouldn't fall
into the wrong crowd. Or maybe if I kept taking the bus that he wouldn't keep looking for
odd job in order to buy a car for his father and I.

Neftaly is very protective toward his family, especially his father and me. He prefers to
walk in the blizzard in order to get our medicine then allow his father to do it. He think of
ours before himself. Neftaly is indeed a blessing to us.

With the will of God, I will attempt to go to court on March 21, 2006 so that I can give my
son the moral support that he needs.

Sincerely, *Madeline Rosado*

Madeline Rosado
Loving mother

Dear, Judge,

I Am very froud To say That i've Known Neftaly Rosado At Least 13 years or more. When He was a child he would come to Church and get involved with the word of God, and also because he Looked Up to me as a brother.

When me and his sister got married I would go over his house for the weekend and do nothing but play video games and talk Like if we were brothers.

But then taly got older and made a few wrong choices In Life.

But Im Sure from what nettaly Been going threw in his Life presently He has Learned a very good Lesson and now I see the taly I knew years ago.

Please your Honor Just give nettaly a chance.

Thank you

Anthony Beauchamp

Dear Judge

I am proud to say I am Neftaly's sister, me and Neftaly ~~was~~ are very close, we were always together. Neftaly and I were brought up in a good home, we had everything a kid wanted. Our parents always gave us good advice. They tried there best to lead us in the right path, Neftaly was a ~~funny~~ kid that never looks for trouble. Until one day he started hanging around the wrong crowed and before you knew it he started getting himself into trouble but now he realizes that he made a big mistake in his life. And those friends you meet are not going to be there at the end. Thanks to God it to one mistake ~~for~~ him to learn. Now Neftaly dedicates his time to the good things in life and his family. Please ~~take~~ in consideration of Neftaly's knew effort in life.

Dear Your Honor,                                   3-14-06

Good day, my name is Tanya Rodriguez. I am Neftaly's sister in-law. I'm writting to you this letter to discuss my reasons and strong beliefs of why this young man should be given a chance from being held back from society. I strongly believe that a conviction will ruin his chance of being seen for who he really is.

Neftaly is a caring and kind young man who is always willing to do favors for his family and intimate friends. Even if that means that he has to take time away from what he was doing or change his plans. He always has a listening ear and a good advise to give me when I need someone to cheer me up.

I have two children and one on its way. My children loves their uncle, he plays a special role in their lives. He is goofy and gentle with them, he always knows how to make them laugh. They adore him, I would love for him to be here when his nephew is born, that only has ten weeks to come into this world. Therefor so he can give the same love and affection to him as he has with his other two nephews.

My brother in-law is multitalented. He is good at writting and singing music. He dedicated to singing at the studio. Also he is enrolled in the G.E.D. program. Something that gives him an excellent motivation to get a training on what is interested to do.  ⟶

In conclusion Your Honor take a look
at Neftaly and see in him what our family
and friends see. Please have compassion towards
him and give to him a chance to prove
to yourself and others that he is a kind gentle
dedicated and loving human being that
still has time to be what he is meant to be.

Sincerely

Tanya Rodriguez

3-17-06

Dear Your Honor,

I'm Juan Rosado, Naftalija brother I aspire
to ask you to give him a break and not
to put him away. He is my younger brother
and I want the best for him. I know who
my brother is and he is not a criminal.

Sometimes in life we chose a person whom
we thought was worthy of our friendships and
has turned out not to be true. We all make
mistakes in life no one person is perfect in life
please consider the fact that out here he can
accomplish good and bigger things for his future.

He is an amazing brother and has a full
life ahead of him. Don't let prison follow
him for the rest of his life, like a shadow
that haunts him for ever. I also ask you
to not to cause a heart break for my moms,
and dad they can't handle such a thing.

Your Honor take my words and thoughts in
consideration.

Sincerely

[signature]

March 16, 2006

P. O. Box 91081
Springfield, MA 01139

Dear Sir or Madam:

This correspondence is in reference to Neftaly Rosado that resides at 111 Massachusetts Ave Springfield, MA 01109. Mr. Rosado is a wonderful young man with bright dreams and goals. I strongly encourage Mr. Rosado to accomplish any goal or obstacle that is set before him. Mr. Rosado offers anyone or companies the will to learn, training and team work environments. He has a will to achieve more in life and meet anyone expectations.

In short of his mishap, Mr. Rosado has taken and accomplishes his responsibility in contacting his probation officer, his attorney, and anyone else that he has to do with his case. Mr. Rosado has met the judge standards and has attempted to go back to school and finish his education. Unfortunately, Mr. Rosado is unable to finish his education do to his sentences date, March 21, 2006.

Mr. Rosado has a rough life, without giving excuses for his action but does play a facture. Through out his case and proceedings, Mr. Rosado was able to expression his feeling through music and have avoid "problems". With the will of God and a lot of luck, soon everybody will know who Neftaly Rosado really is. His album is still being made and is very close to be completed. Mr. Rosado dreams of becoming a singer will come true before or after his sentencing. The sad part about it all is that his mother or father may not be there is see it. There illness may not allow them the time they need to see their son reach his dreams.

In conclusion Mr. Rosado has proving to be responsible, a dreamer, and a loving son. Mr. Rosado would befit more out in society then incarcerated. Mr. Rosado would have an opportunity to finish his goal and make his parents last request, granted.

Thank you for your time and understanding so that I'm able to express my concern for Neftaly Rosado. Yes, he has made mistake just like everyone else but a lesson not learn isn't a lesson at all. I truly believe Neftaly Rosado learned his lesson. Life is too short to gamble with it.

Sincerely,

Ms. A. Enid Morales
P.O. Box 91081
Springfield, MA 01139

# EXHIBIT C



DEC 2 3 2005

MICHAEL SHERRY, PH.D.
#217
351 PLEASANT STREET
NORTHAMPTON, MA 01060
(413) 584-2852

PSYCHOLOGICAL EVALUATION
NEFTALY ROSADO  (DOB: 9/25/86)
12/27/05

Atty. Joseph Bernard requested that I evaluate Mr. Rosado, a 19-year-old single man, prior to sentencing for his involvement in Criminal Action 05-30040–MAP in the United State District Court, District of Massachusetts.

To that end, I interviewed and tested Mr. Rosado on 12/17/05 and 12/23/05. Testing consisted of a standard psychological test battery, including the Rorschach, the Thematic Apperception Test (TAT), and the Personality Assessment Inventory (PAI). I spent 5 hours with Mr. Rosado. I also reviewed material sent to me by Atty. Bernard, specifically the grand jury indictments.

RELEVANT BACKGROUND INFORMATION

This information is all based on Mr. Rosado's report.

Mr. Rosado is the third of four children born to his mother and father; he has two half-siblings from his father's previous relationship.

Mr. Rosado's father, approximately 48 years old, born in Puerto Rico, lives with Mr. Rosado's 22 year old brother in Springfield. Mr. Rosado stated that over the last year he learned that his father has AIDS. He stated that his father, who was always a hard worker (" a beast at work"), was also a heroin addict. His father was in the home until Mr. Rosado was 10 at which point he moved out; Mr. Rosado stated that even though his father moved out, he always stayed involved in the family's life. Mr. Rosado stated that to this day, his father would come by and cook a meal for everyone.

Mr. Rosado speaks with great fondness and respect for his father. He stated his father was his teacher, showing him how to cook, clean, fix

things, pay bills, and establish relationships with woman. He stated that despite his father's habit, he would look after the family. "I always forgave him because he was always a man...he never let us down...he never robbed from us." His earliest memory of his father, which indicates the way he idealizes his father and views him as his protector, was when he was 5 and jumped off a monkey bar, struck his head, and apparently had trouble breathing. In his memory, his father was on the second floor of a building, having seen young Mr. Rosado lying on the ground. "My father jumped out the window, down from the second floor, lifted me up, and made me breathe better."

Mr. Rosado's mother, age 39, is currently sick (HIV positive). When she was younger, she was, according to Mr. Rosado, "the Mom." She helped her husband collect aluminum for his business and was always cooking and cleaning. He described her as very energetic. His earliest memory of her, in some ways similar to his idealizing and protecting memory of his father, was of a time when a neighbor took his puppy when he was approximately 6. "I was crying. My mother grabbed this woman and beat on her. I was surprised because the woman was much bigger than my mother. The woman gave me my dog back. I remember my mother's hands were bleeding. I said 'are you okay? I didn't want you to get hurt for me.' She said 'Don't worry about it. Everything's for you.'"

Mr. Rosado stated that his mother changed approximately seven years ago when her younger brother, a heroin addict, died from AIDS. Since then she has been in and out of a "great depression." He stated that within the last few years she had a seizure and was partially paralyzed for one year. She also had surgery to remove a tumor in her stomach. According to Mr. Rosado, she spends her days in bed, her nights crying. He stated on a typical day she goes to a clinic and spends the rest of her time watching television or sleeping.

Mr. Rosado stated that his parents argued often, but his father did not hit his mother. "My father taught me if you hit a woman, you're a woman yourself."

Mr. Rosado stated that when he was younger, he was a "butter kid" crying if anyone touched him, his bones always hurting. "I'd cry like a little girl." He always felt like the oddball in his family because he often wanted to be by himself and cried more than other people in his family. He stated his family often picked on him (he stated he was also always picked on at school) and that recently he spends less time with his family because his family criticizes him for his relationship with his "girlfriend" Anna.

Mr. Rosado stated he was not in special education classes but was in slow classes for English, reading and math. It is possible that he was slower in

school because he had meningitis when a young child. He stated he was often humiliated at school because he was a crybaby and fat. He recalled being frightened because other kids would sometimes pull his pants down in front of the other kids at recess. He stated he did not start fighting back until he was in 7th grade.

Mr. Rosado stated his parents never disciplined him by spanking although, contradicting himself, he also stated that they stopped spanking him when he was 12. He stated he had a simple childhood that was complicated by his exposure to the drug culture and violence. He recalled that when he was less than 5, he saw his uncle shot in the back outside a pizzeria. Also when he was approximately 5, his grandmother "whooped my ass good" after he accidentally set a fire under her bed, pretending after the fire started that he had not done anything wrong. When he was 6, a 14-year-old baby-sitter had him get naked and then got on top of him. When he was 7, he recalled his 12-year-old sister's boyfriend threw her down a hill, at the bottom of which she lay motionless. He recalled crying because he thought she was dead. "I was traumatized. I didn't come out of my room for two days." When he was 8, he saw his uncle "in the bathroom injecting himself with dope." He stated he was always around drug dealers and drug addicts when he was young. He told himself he would never do drugs, fought with a 13 year old girlfriend when she started smoking, and was, by his report, "the number one DARE student in elementary school."

When Mr. Rosado was 9, an aunt five years his senior gave him a nintendo game only after he would take off his clothes. He stated she had him lay down and she got on top of him, rubbing against him. He could not recall if he physically entered her. He recalled this happening approximately three times. He stated that he was not traumatized by what happened and actually was very close to his aunt for many years. He stated from a very early age, he has been a "horny, little bastard. I was always erected (sic)." He stated that starting when he was 8, he would look at pornographic books and videos that his older male relatives would be watching. He stated he had sexual intercourse when he was 12 with a 23-year-old woman (he also stated that when he was 15, he had sex with a 42-year-old woman regularly. This woman's son, older than Mr. Rosado, would laughingly call him Dad).

Mr. Rosado stated he first drank alcohol (sips of beer) at a family New Year's Eve party when he was 8. He first smoked marijuana when he was 12. He stated he has used a "little bit of everything" although he denies ever using heroin. His favorite drug is marijuana which he stated he smokes every night because it helps him calm down and because it keeps him from getting so angry that he could hurt somebody.

Despite his strong reaction when he, age 8, saw his uncle shooting heroin, Mr. Rosado also acknowledged that he enjoyed being around the drug dealing life. "I saw people making money, lots of it, spending money on drugs, too. I tried to stay away as much as I could. It didn't turn out so good…So many people making two to three thousand dollars a day with stacks of hundred dollar bills in their pocket. I wanted it so badly. I got into the game when I was 13, making money."

When his mother, whose brother had recently died, learned he was dealing drugs when he was 13, she "cried and cried and cried." So Mr. Rosado temporarily stopped dealing and started paying attention to school. His older brother started selling drugs, supporting the family. This older brother and a cousin were arrested and jailed at Ludlow. During their time in jail, "my mother was in a real big shithole financially." When his brother came out of jail, he "hooked up with a lot of females." One of the females, a 27-year-old woman named Anna, had a one-night stand with Mr. Rosado, 17 at the time. When Anna's brother needed a driver for his cocaine trade, Mr. Rosado returned to selling drugs with him.

Around that time, Mr. Rosado stated he joined the All Might Latin King Nation, which he stated helped him because the Nation protected him, gave him advice, and even money sometimes. He stated the gang persuaded him to stop selling drugs, which he did briefly. However, he resumed, giving his mother 8-900 dollars which made her happy because she no longer had financial worries. He believes his mother suspected he was making the money selling drugs.

A few years earlier, when he was 13, Mr. Rosado recalls seeing a 17-year-old friend being gunned down and killed on the street. Mr. Rosado stated he has since seen many people shot but that the first time, he was greatly affected. The later shootings "got old." He stated that as a result of seeing his friend shot and killed, he started carrying a gun for protection. He stated he now regrets ever carrying a gun because he believes that the "unstoppable feeling, like I'm Robocop" that comes with carrying a gun has allowed him to get more and more involved in the drug trade. He believes he would never have gotten into as much trouble with the courts had he not started carrying a gun.

Mr. Rosado stated that a few days after joining the All Mighty Latin King Nation when he was 17, a high ranking gang member came to him, asking him to get him drugs. "I grabbed the stuff, weighed it, collected his money, gave him the stuff, and later learned he was wearing a wire. I didn't get busted until 6 months later."

Mr. Rosado stated that he "kept making money, being happy." He was romantically involved with Anna who maintained a sexual relationship with him although she loved another man, the father of her young son, who was jailed with a lengthy sentence. Mr. Rosado wished that Anna would love him as he loved her. When she asked him to "leave the game" he did so, once more briefly, "jumping back in" because his family---at that point his mother and Anna---needed money. He stated, however, that once more he stopped selling.

Attempting to live a straight life, Mr. Rosado started working as a security guard for two companies in Holyoke and Springfield. "Things were going good, I was making money legally, sitting in front of the cops making money legally, happy as hell." Then he was arrested early one morning for the current charges, realizing when he was in the paddy wagon with his old partners in the game that only one of their associates from those days was not arrested, leading him to realize that the "high up" gang member had turned all of them in.

After his arrest, Mr. Rosado lost his security guard job. He started working as a dishwasher, earning $7 an hour. Because this was not enough money, he quit but could only get a job as a deliveryman, earning $5 an hour. He quit this job and made one final sale to raise money for Anna and his mother.

Mr. Rosado stated that he learned from his father how to treat a woman so that she would like him. "I can win your heart over just like that. I tell them what they want to hear. If her face looks like her ass, I tell her (that) her face looks like her face." He stated he is a Casanova, a lady's man because he is so sexy, that he has had 30-35 females. Nevertheless, even though Anna is in love with another man, the two of them are faithful to each other.

Mr. Rosado also stated that he has not been in physical fights for the last two years when he "hung up (his) gloves." He recalled numerous violent fights in which he would hurt an antagonist and send him to the hospital ("but I never put anybody in the hospital with a coma.") He has thought at times that he has actually killed someone and was relieved to learn that he had not. He described sometimes getting so angry that he would "black out" and not realize the extent of the damage he did to the other person. He told me he did not think it was a good thing for the judge to read about these incidents; nevertheless, he seemed to like talking about his life. "It feels like I got something off my chest."

Finally, Mr. Rosado stated that he once put a gun to his head with the intention of shooting himself after her found out both his parents had

AIDS and after he had been arguing with Anna. This was before his legal problems. He stated he came to his senses when a 6-month-old niece in a crib in the room started crying. He stated he has often thought of killing himself but only has only come close that one time.

## EVALUATION BEHAVIOR

Mr. Rosado was a half-hour early for our first meeting. He did not come to the second appointment because, he told me, he was stranded on the highway after an argument with his girlfriend Anna. On the scheduled morning of our planned second session, after Mr. Rosado was to have had this meeting with me, he and Anna were planning on going together to a prison in the Eastern part of the state where Anna's boyfriend was incarcerated. While driving up to see me that morning, the two began to argue over tensions in their relationship (she wanted him to contribute more financially, he was upset over her relationship with her "husband.") Mr. Rosado stated he was so angry that he felt like "wringing somebody's neck." To avoid that possibility, he stated, he had her drop him off on Rte. 91 between Holyoke and Easthampton. He stated it took him hours to reach his mother's house, where he was banging on walls, enraged.

On interview, wearing a gold crown necklace and two gold earrings, Mr. Rosado, a corpulent young man, was very warm, likable and friendly during this evaluation. Initially suspicious that I might try to hypnotize him and concerned that I would be making him pay me, he relaxed very quickly and seemed to enjoy telling me stories about his life making money selling drugs. A very naïve and emotionally warm young man with little awareness of the life outside of his immediate circle, he took special delight in telling me about his life as a Casanova; he was always very polite, calling me "Doctor" and asking for my professional advice regarding some sticky situations he has encountered with Anna. At the end of our second session, he told me he felt so good from talking to me that he wanted to continue seeing me regularly. I told him that was not possible.

## TEST RESULTS

Mr. Rosado was administered three psychological tests: the PAI, Rorschach, and TAT.

The PAI is a 344 item true-false objective personality test in which the test taker's responses are entered into a computer for a report. The report presents a picture of the person's level of emotional disturbance, kind of disturbance, and other personality factors.

Based on his PAI results, Mr. Rosado presents with thoughts, depressive in nature, that indicate he has negative expectations for himself and has low self-esteem. While he is pessimistic about the future, he does not feel particularly saddened nor does he show other signs of depressions, such as changes in appetite or difficulty sleeping. His PAI results indicate that rather than being clinically depressed, he is saddened and troubled by his current legal situation. He is not someone who is experiencing any other psychiatric symptoms.

Mr. Rosado's personality style is one that involves adventurousness, risk-taking and a tendency to be rather impulsive. This personality style is in keeping with someone who would acknowledge having committed antisocial actions in the past. He also is someone who is easily insulted or slighted and tends to respond by holding grudge against others. He is likely to attribute his own misfortunes to the neglect of others and to discredit the successes of others as being the result of luck or favoritism. While these resentments, when present in the tests of other clients, most likely are related to more of a paranoid personality style, in Mr. Rosado's case, the resentment most likely comes from a socio-cultural stance developed from his feeling that he has lived his entire life in a subculture of poverty, drugs and limited parental support, denied the opportunities of the more mainstream culture.

When Mr. Rosado is facing difficulties in life, as he currently is legally, he evaluates himself negatively. However, when he thinks that things are going well for him, he is full of self-confidence with intact self-esteem. His self-concept is not stable but rather fluctuates as a function of his current situation. He sees any prospects for future success as dependent upon the actions of others.

In relationships with others, according to his PAI answers, he is someone who values his independence and is not particularly concerned about what others think of him. He is notably stressed currently by his legal situation but usually feels that he has a network of people that are looking after him. Some of his relationships are problematic because he is easily angered and can have difficulty controlling his temper. Losses of temper may be sudden and unexpected.

On projective testing, Mr. Rosado presents as someone who is not psychotic; he can perceive the world accurately and the way other people perceive it. He is not depressed or overly anxious. He is discouraged by his current plight and angry that he has not been

able to be as successful as he would have wanted. He is easily bored and seeks excitement. Women are particularly important to him as he seeks their company as a way of structuring his time.

CONCLUSIONS

Mr. Rosado is not a man who is mentally ill; he is discouraged and stressed by his current legal situation. While he welcomed the opportunity to talk about his life, he is not someone who requires psychiatric intervention. He came across during this evaluation as a very warm, friendly, personable, likable young man with a gift for being appealing to others. He also has wanted to help out financially the woman in his life---his mother and his girlfriend.

Mr. Rosado has grown up in a family and a culture removed from many "mainstream" values. He really only knows his very limited cultural world (he asked me once whether marijuana was illegal). He has been exposed throughout his life to extensive drug use, poverty, violence, and precocious sexual activity. His father has been an addict, seemingly throughout much of his life, and has AIDS. His mother, described as once a vibrant woman, has been depressed and also is HIV positive. Mr. Rosado has been exposed to much street violence over the years. Mr. Rosado has had sexual experiences from a very early age. While I am not sure that I would describe him as having been traumatized by molestation, he is someone who has been over aroused and over stimulated from a young age. I suspect that as a result of all of these factors, he has found irresistible the "action" and the easy money that has come with being part of the drug trade, the "game" as he calls it. He is not someone with a refined moral sensibility. I would not say he feels guilty for what he has done but rather that he feels badly that he is now in trouble. He also has flashes of temper and a history of aggressive, violent actions. He currently uses marijuana as a way of maintaining some placidity.

Based on the above, it is not difficult to see how Mr. Rosado would develop as he did, given the environment in which he has lived all of his life. It is not easy to see how he could have turned out differently. At the same time, it is also difficult to see what mental health interventions would be sufficiently salient to alter the way his life goes. He is not sufficiently anxious and/or depressed about who he is to want to change his way of life. He is

troubled by his legal plight, regrets some of his decisions, but that is a far cry from feeling that he himself has to change.

Michael Sherry, Ph.D.
Licensed Psychologist

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) **Criminal Action No.: 05-30040-MAP** |
| | ) |
| NEFTALY ROSADO | ) |

**MOTION FOR DOWNWARD DEPARTURE**

I hereby certify that on March 20, 2006, a true copy of the above document was served by HAND DEVLIVERY upon United States District Attorney Paul Smyth, Federal Building and Courthouse, Room 310, 1550 Main Street, Springfield, MA 01103.

Joseph D. Bernard
The Law Offices of Joseph D. Bernard, P.C.
73 State Street, Suite 301
Springfield, MA 01103
(413) 731-9995
(413) 730-6647 fax
BBO#: 557986

Date:   March 20, 2006